UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ISAIAH THOMAS NEW,

      Plaintiff,

v.

M&T BANK CORPORATION, *et al.*,

      Defendants.

21-CV-1186-LJV
DECISION & ORDER

---

On November 2, 2021, the *pro se* plaintiff, Isaiah Thomas New, commenced this action under 42 U.S.C. § 1981, the New York State Human Rights Law, and New York State common law. Docket Item 1; *see* Docket Item 6 (amended complaint). New, a former employee of M&T Bank Corporation ("M&T" or "M&T Bank"), alleges that the defendants—M&T, Manufacturers and Traders Trust Company, M&T Deputy Counsel Arthur H. Salman, and several John Does—discriminated against him on the basis of race and unlawfully retaliated against him when he complained about the discrimination. *Id.*

On September 6, 2022, the defendants moved to dismiss the amended complaint, Docket Item 11; on September 28, 2022, New responded, Docket Item 17; and on October 12, 2022, the defendants replied, Docket Item 18.

For the reasons that follow, the defendants' motion to dismiss will be granted unless New files a second amended complaint correcting the deficiencies identified below.

**FACTUAL BACKGROUND**[1]

From July 2017 to June 2018, New—a Black man with "a bachelor's degree in economics from an Ivy League university," Docket Item 6 at ¶¶ 5, 7—worked in M&T's Finance Division as a "Management Trainee and Corporate Analyst," *id.* at ¶ 10.  He was "the only [B]lack employee" out of "approximately 75 staff" members on the floor where he worked, *id.* at ¶ 7, and "one of less than eight" Black employees "in the entire 350-person Finance Division," *id.* at ¶ 8.

Shortly after he started at M&T, New began to experience "daily harassment, verbal abuse[,] and racist jokes."  *Id.* at ¶ 17.  For example, New's manager—a white man—"yelled at [New] for various petty and insignificant things," *id.* at ¶ 18, but "did not treat other bank employees . . . in such a manner," *id.* at ¶ 19.  New repeatedly raised concerns about his manager's conduct and documented those concerns in writing.  *Id.* at ¶¶ 20-22, 25.  M&T's human resources department ("HR") met with New and conducted an investigation but found "no evidence of misconduct or discrimination."  *Id.* at ¶¶ 25-26.  HR assigned New to a different manager but took no other "remedial action."  *Id.* at ¶ 26 (emphasis omitted).

---

[1] In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

The following facts are taken from the amended complaint, Docket Item 6, and the separation agreement referenced throughout the amended complaint, Docket Item 11-3; *see Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (noting that a complaint is deemed to include any written instrument that is incorporated by reference or "integral" to the complaint).

In the following months, the harassment "increased in frequency and severity." *Id.* at ¶ 28.  For example, a white secretary "spread[] rumors that [New] was 'brown-nosing' favor and 'sucking[ ]up to' managers," causing New "reputational harm."  *Id.* at ¶ 29.  And a group of white employees "would regularly congregate in front of [New's] cubicle and make lewd, offensive jokes about African-Americans."  *Id.* at ¶ 33.

New continued to report the harassment to HR.  *Id.* at ¶¶ 31-32, 36.  Eventually, he brought his concerns about the racist jokes to M&T Deputy Counsel Salman, who told New to "call [him] when it happens again" but did not take any other action to address the harassment.  *Id.* at ¶¶ 36-37 (emphasis omitted); *see id.* at ¶ 14.  A few months later, New requested another meeting with Salman to report "racist graffiti" that New had seen in the workplace.  *Id.* at ¶¶ 37-38.  Again, Salman took no action.  *Id.* at ¶ 39.

Then, on June 7, 2018, Salman told New that M&T was terminating New's employment due to "performance" and "trust" issues.  *Id.* at ¶ 46.  New believed those "issues" were pretextual because neither New's manager nor the department head would "enumerate a single performance issue" when asked.  *See id.* at ¶¶ 46-59, 62.  And despite M&T's policy "to provide employees with . . . escalating feedback, written warnings[,] and corrective action notices before terminating an employment relationship," New had received no warnings regarding any performance issues prior to the termination meeting.  *Id.* at ¶ 63.

During the meeting, Salman presented New with a separation agreement that "was intended to release M&T Bank from any claims arising from [New's] employment."  *Id.* at ¶ 76.  It included the following language:

3

> You, for and in consideration of the promises set forth in this Agreement, hereby agree to release and discharge, and not to institute any suit or action . . . , against M&T Bank . . . , on your behalf and on behalf of any person or entity claiming by or through you, from any and all claims of any kind, known and unknown, which you may now have or have ever had against M&T Bank, including claims . . . arising from your employment with M&T Bank or the termination of your employment with M&T Bank, whether based on contract, tort, statute, local ordinance, regulation[,] or any comparable law in any jurisdiction ("Released Claims"). By way of example and not in limitation, the Age Discrimination in Employment Act of 1967. . . , Title VII of the Civil Rights Act of 1964 . . . , the Americans with Disabilities Act of 1990 . . . , the Equal Pay Act of 1963 . . . , the New York Human Rights Law, and the Family and Medical Leave Act of 1993 . . . , as well as any claims asserting wrongful termination, breach of contract, breach of the covenant of good faith and fair dealing, negligent or intentional infliction of emotional distress, negligent or intentional misrepresentation, . . . and any other federal, state or local law, rule, regulation, executive order[,] or guidelines relating to discrimination . . . .
>
> This Agreement covers both claims that you know about and those that you may not know about at this time. This Agreement does not waive or release any rights or claims that may arise *after* you sign this Agreement.

Docket Item 11-3 at 4-5 (emphasis in original). It also provided that New could "revoke" the agreement "within seven [] calendar days" of signing it. *Id.* at 2.

As New "perused" the separation agreement, he asked Salman "what he thought of the many claims" New had reported. Docket Item 6 at ¶ 76. Salman responded, "[T]hey're all in your head." *Id.* (emphasis omitted). That statement convinced New that he was "imagining the abuse and discrimination he suffered." *Id.* at ¶ 77 (emphasis omitted).

New's original deadline to sign the agreement was June 15, 2018, Docket Item 11-3 at 6, but he requested and received a five-day extension, Docket Item 6 at ¶¶ 82-83. Although New contacted multiple attorneys during that time, he was unable to find "competent counsel" to advise him. *Id.* Some attorneys he spoke to "were hesitant to litigate a discrimination case against M&T" and would not give New "adequate advice."

4

*Id.* at ¶ 82.  Others "required prohibitive sums of money for consultation."  *Id.*  And one "refused" to speak with New because the attorney was "an acquaintance of a former M&T Bank executive."  *Id.* at ¶ 83.

New finally signed the separation agreement on June 22, 2018, 15 days after the termination meeting.  Docket Item 11-3 at 6; *see* Docket Item 6 at ¶ 76.  In exchange, he received payment of 60 days' wages after his employment ended, compensation for accrued vacation days, 60 days' continuation of his health insurance, and some continuation of his life insurance and personal accident insurance.  *See* Docket Item 11-3 at 2-3.

In October 2021—more than three years later—New learned that he had "valid claims of racial harassment and discrimination" related to his employment at M&T, Docket Item 6 at ¶ 84, and he unsuccessfully "offered to tender back the consideration he [had] received" under the separation agreement, *id.* at ¶ 88.  New then commenced this action alleging that the defendants fraudulently induced him into signing the separation agreement.  *See id.* at ¶¶ 84-86.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## **DISCUSSION**

The defendants argue that the amended complaint must be dismissed because New "released all employment-related claims against M&T, M&T's affiliates, and those companies' employees and agents" when he signed the separation agreement. Docket Item 11-1 at 5. New responds that his claims are not barred because he "was fraudulently induced into [signing] the separation agreement." Docket Item 17 at 5. Because New has not plausibly alleged that he was fraudulently induced into signing an enforceable separation agreement, that separation agreement bars New's claims.

## I.   FRAUDULENT INDUCEMENT

A plaintiff alleging fraudulent inducement must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *NRW, Inc. v. Bindra*, 775 F. App'x 22, 24 (2d. Cir. 2019) (summary order) (citing *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006)).

New alleges that Salman fraudulently induced him into signing the separation agreement by stating that New's "claims" were "all in [his] head." Docket Item 6 at ¶ 76 (emphasis omitted); *see id.* at ¶¶ 108-13. The defendants argue that New has not plausibly alleged two elements of a fraudulent inducement claim: (1) a material false representation and (2) reasonable reliance. Docket Item 11-1 at 17-20.

### A.     Material False Representation

For purposes of fraudulent inducement, a material false representation must be "either a misrepresentation or [] material omission of a *fact*." *Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (emphasis added) (citation omitted). "Expressions of mere opinion or puffery are not actionable representation of fact sufficient to state a claim for fraud." *Spin Master Ltd. v. Bureau Veritas Consumer Prods. Servs., Inc.*, 2011 WL 1549456, at *10 (W.D.N.Y. Mar. 7, 2011) (internal quotation marks omitted) (collecting cases).

The defendants argue that Salman's statement was "not a misrepresentation of an existing fact." Docket Item 11-1 at 19. New responds that the defendants draw an "artificial distinction between fact and opinion." Docket Item 17 at 2. But the defendants are correct: Salman's statement was an expression of opinion about the merit of New's potential legal claims. *Cf. Von Turkovich v. APC Cap. Partners, LLC*, 259 F. Supp. 2d 314, 321-22 (D. Vt. 2003) (finding that defendant's statement that an agreement "would accomplish [p]laintiffs' goals" was "not a statement of existing fact but an opinion . . . of the future value of the agreement").

New argues that Salman intended to deceive him and "that opinions may be actionable *if* they are disbelieved when made." Docket Item 17 at 2 (emphasis in original). But as the defendants note, *see* Docket Item 18 at 7-8, New bases that argument on a series of cases finding that credit ratings are a "hybrid" of fact and opinion and thus can be a material misrepresentation, *see, e.g., Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 454-55 (S.D.N.Y. 2012) (noting that credit ratings are "based on an analysis of underlying facts conducted by respected

7

rating organizations"). Salman's statement was not a "hybrid" of fact and opinion analogous to a credit rating, so those cases are inapposite.

Indeed, while New argues that Salman's experience lent his opinion credibility and caused New to believe that Salman had "analyzed data, conducted an assessment, and reach a fact-based conclusion" as to the merits of any potential claims, Docket Item 17 at 2, New does not allege facts suggesting he believed that Salman conducted such an assessment. To the contrary, New alleges that Salman took no action to investigate his complaints. *See* Docket Item 6 at ¶ 36. So it is unclear why New would think that Salman's opinion was based on any factual analysis. In other words, even if Salman's statement was disingenuous, it was not a factual misrepresentation.

New therefore has not plausibly alleged that Salman made a material false representation, a required element of a fraudulent inducement claim.

### B.     Reasonable Reliance

"Claimants alleging reasonable reliance must plead that they actually relied on the alleged misrepresentation[]" at issue. *Travelex Currency Servs., Inc. v. Puente Enter., Inc.*, 449 F. Supp. 3d 385, 399 (S.D.N.Y. 2020) (citation omitted). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (citations omitted).

"Often, whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered

8

inappropriate for determination on a motion to dismiss." *Robinson*, 572 F. Supp. 2d at 322-23 (alteration and internal quotation marks omitted) (collecting cases). But "under certain circumstances, dismissal is appropriate at this stage in the litigation." *Id.* at 323.

New argues that "he felt compelled to sign the separation agreement based on [Salman's] statement[]." Docket Item 17 at 4. But as the defendants note, Docket Item 11-1 at 19, New did not sign the separation agreement immediately after he heard Salman's statement. In fact, New did not sign the agreement during the termination meeting or even by the original deadline M&T set. Rather, after New left the meeting, he requested and received an extension of time and contacted multiple attorneys to seek legal advice about the merits of his claim. *See* Docket Item 6 at ¶¶ 82-83. He signed the separation agreement more than two weeks after Salman made the statement that allegedly induced New to release his claims. *See* Docket Item 11-3 at 6.

Even viewed in the light most favorable to New, that sequence of events does not raise a plausible inference that New actually relied on Salman's statement. On the contrary, it suggests that New was skeptical of Salman's statement and felt the need to obtain an objective opinion about the merits of his potential claims from an attorney not associated with M&T. The fact that New now says he was unable to find an attorney to advise him does not change that analysis, especially because the separation agreement included an acknowledgment that New "availed" himself of his right to seek legal counsel "to the extent [he] desired."[2]  *Id.* at 5.

---

[2] What is more, even if New actually relied on Salman's statement, that reliance likely was not reasonable. Salman clearly was incentivized to minimize M&T's liability and discourage New from pursuing legal action, and New should have known that given his education and experience. *See, e.g., Von Turkovich*, 259 F. Supp. 2d at 322-23 ("[G]iven [p]laintiffs' business and financial sophistication, no rational trier of fact could

New therefore has not plausibly alleged that he reasonably relied on Salman's statement. And for that reason as well, he has failed to state a claim for fraudulent inducement.

## II. VOLUNTARY RELEASE OF CLAIMS

In addition to arguing that New was not fraudulently induced, the defendants say that the separation agreement is enforceable because New signed it knowingly and voluntarily. Docket Item 11-1 at 10-17. New does not dispute that contention. *See* Docket Item 17 at 3 (arguing that New's knowledge and voluntariness "does not preempt" his fraudulent inducement claim). Nevertheless, the Court considers whether the separation agreement is enforceable.

"Federal courts have articulated a strong policy in favor of enforcing settlement agreements and releases." *Levine v. Bd. of Educ. of City of N.Y.*, 152 F.3d 919, 1998 WL 386141, at *2 (2d Cir. 1998) (summary order) (collecting cases). Under federal law, a release generally is enforceable if the party's waiver of his claims "was 'knowing and voluntary' under the totality of the circumstances." *Pucilowski v. Spotify USA, Inc.* ("*Pucilowski I*"), 2022 WL 836797, at *4 (S.D.N.Y. Mar. 21, 2022), *aff'd*, 2022 WL 16842926 (quoting *Bormann v. AT&T Commc'ns, Inc.*, 875 F.2d 399, 400-03 (2d Cir. 1989)); *see id.* (explaining that a release that is enforceable under federal law "will necessarily" be enforceable under New York law (citations omitted)).

---

conclude that they justifiably relied on an opinion from another business person, with whom they were in an adversarial relationship, that the transaction would accomplish their goals."); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 230 (S.D.N.Y. 2007) (with regard to transaction for sale of company, finding that "no reasonable factfinder" could find it reasonable to rely on defendant's statement that "everything's going to be fine").

10

Courts in this Circuit consider several factors when evaluating whether a release was entered into knowingly and voluntarily, including:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of [the] plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, . . . 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law . . . [and 7)] whether an employer encourages or discourages an employee to consult an attorney . . . and whether the employee had a fair opportunity to do so.

*Bormann*, 875 F.2d at 403 (citations omitted); *see Pucilowski I*, 2022 WL 836797, at *4. That list is not exhaustive, and all factors need not be satisfied for a release to be enforceable. *Long v. Corning Inc.*, 2020 WL 1467278, at *5 (W.D.N.Y. Mar. 26, 2020), *aff'd*, 847 F. App'x 74 (citation omitted).

Here, the *Bormann* factors and the totality of the circumstances weigh in favor of enforcement.

### A.   New's Understanding of the Agreement

First, the Court considers the factors bearing on New's ability to understand the separation agreement: (1) New's education and experience and (2) the clarity of the agreement itself.

New's education and experience weigh in favor of enforcing the separation agreement. New describes himself as "highly-educated," Docket Item 6 at ¶ 81, and notes that he earned a bachelor's degree from an Ivy League university, *id.* at ¶ 5. Those qualifications suggest that New had the experience to "understand the [a]greement and assess the costs and benefits of signing it." *See Westbrooke v. Bellevue Hosp. Ctr.*, 2018 WL 4189514, at *4 (S.D.N.Y. Aug. 31, 2018). In fact, courts

have found plaintiffs with significantly less education and experience capable of understanding the terms of a release.  *See Bachiller v. Turn On Prods., Inc.*, 2003 WL 1878416, at *4 (S.D.N.Y. Apr. 14, 2003) (holding that plaintiff with high school equivalency diploma was capable of understanding release); *see also Pucilowski I*, 2022 WL 836797, at *5 (collecting cases).

The clarity of the agreement itself—which "may be the most important" *Bormann* factor, *Pucilowski I*, 2022 WL 836797, at *4—also weighs in favor of enforcement.  The release section of the separation agreement is "clear, concise, and written in plain language."  *See Phillips v. Orleans County*, 2019 WL 3088051, at *7 (W.D.N.Y. July 15, 2019).  It "unambiguous[ly]" states that by signing, New forfeited the right to bring any claims—known or unknown—against M&T arising from his employment, *see Pucilowski I*, 2022 WL 836797, at *4, and New does not allege that he did not understand the agreement's terms, *see generally* Docket Item 6.

So both factors bearing on New's understanding of the agreement favor enforcement.

### B.  New's Time to Consider the Agreement and Opportunity to Consult Counsel

Next, the Court considers whether New had sufficient time to consider the separation agreement and consult counsel.

Although there is no bright line rule for what constitutes sufficient time for a plaintiff to evaluate an agreement, courts in this Circuit "have concluded that a period of months will suffice, that a few days will suffice, and that even a few hours will suffice." *Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 130 (S.D.N.Y. 2012) (collecting cases) (internal citations omitted).  The Second Circuit itself has noted that a two-week

period to consider an agreement in combination with a seven-day revocation period "preclude[s] any finding that [a plaintiff] was not given sufficient time to knowingly and voluntarily release her claims." *Pucilowski v. Spotify USA, Inc.* ("*Pucilowski II*"), 2022 WL 16842926, at *1 (2d Cir. Nov. 10, 2022).

Here, New signed the agreement 15 days after it was presented to him.[3]  *See* Docket Item 6 at ¶¶ 76-77; Docket Item 11-3 at 6.  That period included a five-day extension giving New additional time to consult counsel, Docket Item 6 at ¶ 82, and the agreement included a seven-day revocation period, Docket Item 11-3 at 1.  The time New had to consider the agreement therefore favors enforcement.  *See Pucilowski II*, 2022 WL 16842926, at *1.

Moreover, New spoke to multiple attorneys during that time, Docket Item 6 at ¶¶ 82-83, demonstrating that he had a fair opportunity to consult counsel.  While New says that he was unable to obtain counsel for a variety of reasons, *id.*, the separation agreement stated that by signing, New acknowledged that he had consulted counsel "to the extent and for the purposes [he] desired," Docket Item 11-3 at 6.  So even though New now suggests that he did not obtain sufficient legal counsel, that "does not automatically render" the agreement invalid.  *See Rozenfeld v. Dep't of Design & Constr. of City of N.Y.*, 875 F. Supp. 2d 189, 200 (E.D.N.Y. 2012); *Pucilowski I*, 2022 WL 836797, at *6 (finding that although plaintiff was not counseled by an attorney, the defendant gave plaintiff "fair opportunity to seek out counsel by providing her with plenty

---

[3] In response to the motion to dismiss, New says that he "was held in a room that he was told he could not leave." Docket Item 17 at 3. But clearly, New was permitted to leave the meeting without signing the release.

of time—fourteen days before signing—to do so" (citation and internal quotation marks omitted)).

For those reasons, the time New had to consider the agreement and consult counsel favors enforcement.

### C.     Consideration

The Court also considers the consideration New received in exchange for releasing his claims, which included payment of 60 days' wages after his employment ended, compensation for accrued vacation days, 60 days' continuation of his health insurance, and some continuation of his life insurance and personal accident insurance. *See* Docket Item 11-3 at 2-3.  Those are "benefits to which [New] was not otherwise entitled," favoring enforcement of the agreement.  *See Phillips*, 2019 WL 3088051, at *7.

### D.     New's Role in Drafting the Terms of the Agreement

Finally, the Court considers the fact that New apparently took no part in the drafting of the terms of the separation agreement, *see generally* Docket Item 6, which weighs against enforcement.  Nevertheless, a plaintiff's role in drafting the terms of a waiver cannot alone raise an issue of voluntariness.  *Bormann*, 875 F.2d at 403 n.1.

And here, based on the totality of the circumstances, the other *Bormann* factors indicate that New entered into the separation agreement knowingly and voluntarily.  The separation agreement therefore is enforceable and bars New's claims.

### III.     LEAVE TO AMEND

Generally, a court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citation omitted); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A *pro se* complaint is to be read liberally.  Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999))).  But leave to amend pleadings may be denied when amendment would be "futile."  *Cuoco*, 222 F.3d at 112.

New requests leave to amend his complaint to assert a claim for negligent misrepresentation.  Docket Item 17 at 5.  But the separation agreement explicitly bars New from asserting such a claim, *see* Docket Item 11-3 at 4, so that claim would fail unless the agreement is unenforceable.  And for the reasons noted above, that does not appear to be the case.

Nevertheless, and in light of his *pro se* status, *see Cuoco*, 222 F.3d at 112, New may amend his complaint to add facts establishing that the agreement is not enforceable.  To do that, New must allege facts showing either (1) that he reasonably— and actually—relied on a material misrepresentation of fact made by the defendants other than Salman's statement that New's claims were all in his head, or (2) that the waiver of his claims was not knowing and voluntary.

New is advised that an amended complaint is intended to **completely replace** the prior complaint in the action and thus "renders [any prior complaint] of no legal

15

effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (citations omitted); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any second amended complaint **must include all allegations against each of the defendants** so that the second amended complaint stands alone as the only complaint that the defendants must answer in this action. Further, New is advised that the factual allegations in his first amended complaint do not raise a plausible inference that he is entitled to relief, and he therefore should amend his complaint a second time only if he can plead additional facts in support of his claims.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss, Docket Item 11, will be granted unless New files a second amended complaint **within 30 days of the date of this order**. If New does not file a second amended complaint within that time, the defendants' motion to dismiss will be granted and the Clerk of the Court shall close this case without further order.

SO ORDERED.

Dated:   January 2, 2024
         Buffalo, New York

                                         /s/ Lawrence J. Vilardo
                                         LAWRENCE J. VILARDO
                                         UNITED STATES DISTRICT JUDGE